# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

WILLIAM and ELIZABETH TIS,
BARRY and BRENDA HOOKS, MARK
and WANDA MCMILLIAN, on behalf of
themselves and all others similarly
situated;

                Plaintiffs,

    v.

WAUPACA ELEVATOR COMPANY,
INC.;

                Defendant.

**Case No. 21- CV-**

**CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiffs, William Tis and Elizabeth Tis, Barry Hooks and Brenda Hooks, Mark McMillian and Wanda McMillian, on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this class action lawsuit against Defendant Waupaca Elevator Company, Inc. to obtain damages, restitution, and injunctive relief for the Class, as defined below, resulting from the fraudulent omissions and unfair and deceptive trade practices engaged in repeatedly by Defendant, and allege, based upon information and belief, the investigation of their counsel, and the facts that are a matter of public record, the following:

## PARTIES

1.      Plaintiffs William Tis and Elizabeth Tis are, and at all relevant times were, citizens of the state of Pennsylvania, in the city of Verona, in the county of Allegheny. Plaintiffs William and Elizabeth Tis own, and at all times mentioned herein have owned, a beachfront home in North Carolina, in the town of Surf City, in the county of Pender. The home was built in 2006 and purchased by Plaintiffs Tis in 2013 as a vacation rental property. The three-story home features a

1

Waupaca elevator.

2.     Plaintiffs Barry and Brenda Hooks, are, and at all relevant times were, citizens of the state of North Carolina residing in the town of Shallotte, in the county of Brunswick. Plaintiffs Hooks own a townhouse that features a Waupaca elevator. Plaintiffs Hooks purchased the townhouse in 2013, approximately eight years after it was built.

3.     Plaintiffs Mark and Wanda McMillian are, and at all relevant times were, citizens of the state of North Carolina residing in the town of Kure Beach, in the county of New Hanover. Plaintiffs McMillians' home was built in 2005, with a Waupaca elevator installed at the time of construction. The McMillians purchased the home in 2012.

4.     Defendant Waupaca Elevator Company, Inc. is a private, for-profit professional corporation incorporated and existing under the laws of the state of Wisconsin. Its registered office and principal place of business is located at 1726 North Ballard Road, Appleton, Wisconsin 54911. Waupaca manufactures and produces elevators which it distributes through a network of authorized dealers and service companies for sales and installation throughout the United States, including North Carolina.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the Class are citizens of a state different from Defendant.

6.     Venue is proper pursuant to 28 U.S.C. § 1391 in that Plaintiffs reside in this District, many of the acts and transactions giving rise to this action occurred in this District, and Defendant is authorized to conduct business in this District. Defendant has intentionally availed itself of the laws and markets within this District through distribution and sale of its products in this District,

conducts substantial business in this District, and is subject to personal jurisdiction in this District.

## NATURE OF THE CASE

7. This class action arises out of a purported "recall" of the gearboxes in certain models of dangerously defective residential elevators produced by Waupaca Elevator Company.

8. The "recall" was announced on October 25, 2018, approximately 20 years after Waupaca received the first report of one of its elevators free falling and crashing.

9. Between 1998 and 2018, at least 15 Waupaca residential elevators had gear failure, free fell and crashed. Defendant Waupaca was required by federal law to report these events to the U.S. Consumer Product Safety Commission ("CPSC").

10. Ultimately, in 2018, Defendant Waupaca participated in a CPSC program called "FastTrack," through which Waupaca was given the opportunity to take supposedly proactive measures to warn its customers about the potential for gear failure, and to recall and replace the defective parts. In exchange for the elevator manufacturer's voluntary "proactive" measures, the CPSC would not issue a statement of Waupaca's liability.

11. Far from a "fast track," however, the recall proceeded, and continues to proceed, on a slow and meandering path, with Waupaca elevator owners receiving dangerously misleading information, conflicting guidance, ineffective "diagnostic" tests, and a wait list of up to two years for a faulty "fix" that many homeowners have had to pay for despite its being part of the recall.

12. For many years and continuing until the present, Defendant Waupaca has engaged in practices that negligently misrepresent, omit to disclose and otherwise violate North Carolina's Unfair and Deceptive Trade Practices Act, imperiling the safety of Plaintiffs and Class Members, depriving them of the use of parts of their homes and property, and causing them to incur significant expense as a result of Waupaca's actions and inactions.

3

13.	Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's multiple misrepresentations, omissions, and fraudulent concealments in the handling of the "recall" of certain models of their elevators, which behavior also constitutes unfair and deceptive trade practices.

14.	Plaintiffs also bring this class action lawsuit on behalf of those similarly situated to address Defendant's use of the "recall" to bolster sales of their own manufactured goods including but not limited to overspeed braking devices, new models of elevators and new mechanical workings to replace all but the carriage on the recalled models.

15.	As a direct and proximate result of Defendant's negligent misrepresentations, omissions, and violations of the North Carolina Unfair and Deceptive Trade Practices Act, Plaintiffs and Class Members have suffered and will continue to suffer damages and economic losses and seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, restitution, and declarative and injunctive relief.

## STATEMENT OF FACTS

16.	The official Waupaca elevator recall began on October 25, 2018.  In advance of and in anticipation of its recall, Defendant Waupaca began sending a Dealer Safety Notice Letter in early to mid-2018 to its authorized (and other) dealers and repair shops, misleadingly portraying the dangerous ring gear and gear box problem as a matter of normal wear and tear.  Waupaca instructed its dealers to send to their customers with affected elevators an "Important Safety Notice" and "Tech Bulletin" regarding 450- and 500-pound models with particular serial numbers. A copy of the Dealer Safety Notice Letter is attached as **Exhibit A**, and the accompanying Tech Bulletin and Important Safety Notice is attached as **Exhibit B**.

4

**The Dealer Safety Notice Letter**

17.     The Dealer Safety Notice Letter instructed dealers to share the Tech Bulletin with all of their technicians and, by July 31, 2018, to mail the Tech Bulletin and Notice "to every customer in your database who purchased the affected elevator types." **Exhibit A**, page 1.

18.     The Dealer Safety Notice Letter also instructed the dealers that, after mailing, they should maintain, "[t]he name and address for each customer you contacted," the date of mailing, and identifying information for each customer's elevator  **Exhibit A**, page 2.

19.     Although Waupaca had instructed its dealers to maintain records, Plaintiffs are informed and believe that  Waupaca did not request a report from each of its authorized dealers and repair operations as to which elevator owners had received the Notice, or contact information for further communications about the upcoming recall.

**The Important Safety Notice and Tech Bulletin**

20.     The "Important Safety Notice" and "Tech Bulletin" accompanying the "Dealer Safety Notice" were intended for the elevator owners as Waupaca instructed its dealers to mail them to elevator owners.  At the top, the undated Important Safety Notice stated:

    To: Owners of Waupaca Elevators

    Regarding: Potential failure of a portion of the lifting mechanism resulting in a
    possible unexpected drop of your elevator.

    Waupaca Elevator Company has become aware of a potential safety concern with
    your elevator.

5

**Exhibit B** and the relevant portion is set out below.

To: Owners of Waupaca Elevators

Regarding: Potential failure of a portion of the lifting mechanism resulting in a possible unexpected drop of your elevator.

Waupaca Elevator Company has become aware of a potential safety concern with your elevator.

This potential hazard is associated with normal wear in your elevator. This is not a defect in the product, simply a possible type of failure caused by normal use over time. In response to this potential hazard we recommend you contact your elevator installer or service company. If you need assistance locating a service company or answering questions please call us at (920) 997-0920.

21.     The notice falsely attributed the problem to "normal wear and tear" and claimed it was not a "defect": "This potential hazard is associated with normal wear in your elevator. This is not a defect in the product, simply a possible type of failure caused by normal use over time." The notice also included the following warning:

**WARNING** - If your elevator develops this problem and it is not repaired, the elevator may drop unexpectedly with you in it and you may be injured.

**Exhibit B**, page 1.

22.     The Important Safety Notice also included a section entitled, "**Symptoms of Possible Failure**" that described a set of symptoms that elevator owners should watch for. "Prior to a complete failure there **will be** symptoms that the failure is beginning. As the gearbox wears out you **will** notice one or more of the following symptoms[]" including tripping of the circuit breaker, a ticking sound from the elevator motor during operation, or the elevator stopping during

6

operation. (emphasis added). An excerpt of the Notice is below:

> **Symptoms of Possible Failure**
> The development of this problem will occur gradually. It is not possible to visually inspect your gearbox to determine if or when a failure may occur. Prior to a complete failure there will be symptoms that the failure is beginning. As the gearbox wears out you will notice one or more of the following symptoms:
>
> 1. Tripping of the circuit breaker that serves your elevator
> 2. Ticking sound from the elevator motor when it is running
> 3. Elevator that stops during operation

**Exhibit B**, page 1.

23.     Unfortunately, the assertions made by Waupaca in its Tech Bulletin and Important Safety Notice above in the early months of 2018 were untrue and misleading.

24.     The "symptoms" Waupaca stated were precursors to, and predictive of, an elevator free fall and crash did not in fact precede many of the crashes.

25.     Waupaca's Tech Bulletin and Important Safety Notice lulled owners of its soon-to-be recalled elevators into believing they would know when their elevators were going to fail and did not disclose that their elevators could fail without exhibiting any of the specified symptoms.

26.     Waupaca knew that the elevators were likely to fail but failed to disclose that fact and instead blamed the problem on "normal wear and tear."

27.     These communications to many Waupaca elevator owners were the first of the false, misleading and dangerous statements made by Waupaca to consumers.

28.     Plaintiffs are informed and believe that, in early 2018 when Waupaca sent out the above-described notices to its dealers, Waupaca had known of this condition for many years. Waupaca had received numerous reports and much documentation regarding failures and injuries caused by falls and crashes and has been sued as a defendant for these failures in multiple state

7

court actions, including several in North Carolina.[1]

**Waupaca recalls the elevators pursuant to the CPSC's Fast-Track Recall Program**

29.     Finally, in October of 2018, Waupaca and the U.S. Consumer Product Safety Commission made the official announcement of Waupaca's "recall" of approximately 8,000 of its Custom Lift 450 and Custom Lift 500 elevators manufactured between 1976 and 2008.

30.     The elevators subject to the recall were Custom Lift 450 and Custom Lift 500 elevators manufactured between 1976 and 2008.

31.     On such elevators the cables that support, lift and lower the elevator cab are attached to a drum, similar to the one depicted here.



*Figure 1:  Winding drum and gearbox from a recalled Waupaca elevator*

32.     The drum is turned (causing the elevator cab to raise or lower) when the elevator's motor moves a worm gear, which in turn moves a larger ring gear.  These gears are contained in a gearbox.

33.     The teeth of the ring gear used in these elevators, according to Waupaca, are prone to being shorn off during operation. When this happens, the ring gear loses its connection to the worm gear and motor, providing no resistance to the drum and cables.  The result is an elevator

---

[1] See Brackin v. Waupaca Elevator Co, No. 7:21-CV-00094-BO, in U.S. District Court, Eastern District of N.C., Southern Division; Fortenberry v. 1364 OBW, LLC, Waupaca Elevator Co. and Port City Elevator, 21 CVS 187, Brunswick County (N.C.) Superior Court. See also Ryan v. Waupaca Elevator Co. et al, 18 CVS 4366, New Hanover County (N.C.) Superior Court.

cab that falls to the bottom of the elevator shaft and crashes.

34.     The recall effort was initiated on the CPSC's Fast Track, a program offered

35.     ` by the CPSC to encourage manufacturers to come forward, of their own volition,

to recall dangerous products more quickly.

36.     According to the CPSC's website,[2] the program offered Waupaca several benefits:

> Businesses that successfully complete the Fast-Track
> program benefit in the following ways:
>
> - *CPSC staff will not make a preliminary determination (PD) that the product contains a defect* that creates a substantial product hazard. (*Some businesses are concerned about the effect of a CPSC staff PD on their firm due to concerns about product liability and other private lawsuits*.)
>
> - By removing the product from commerce quickly, the potential for incidents and injuries to consumers from potentially harmful products may be reduced, and *may therefore reduce the occurrence of product liability claims or other lawsuits.*
>
> - Voluntary corrective action by the recalling business is completed much faster.
>
> - Businesses are assigned a point of contact at CPSC who will guide them through the recall process. Office of Compliance staff will provide a significant amount of assistance to first-time participants in the Fast-Track program as they go through the recall process.

37.     The recall also stated that "Waupaca Elevator also will provide the installation of a

free gearbox if the gearbox inspection reveals that the gears in the gearbox have worn down."

38.     The promise of a free replacement gearbox as a part of the initial "recall" was

another false and misleading assertion made by Defendant Waupaca. At the time of initiating the

---

[2] United States Consumer Product Safety Commission, *Learn About the Fast Track Program*, https://www.cpsc.gov/Business--Manufacturing/Recall-Guidance/CPSC-Fast-Track-Recall-Program (last visited March 4, 2021).

9

recall and **continuing through the present**, Waupaca has failed to produce and/or make available a sufficient number of replacement gearboxes to owners of its recalled elevators to prevent crashes. Plaintiffs are informed and believe that Waupaca knew that it would not have sufficient gearboxes to use as replacements when it issued the recall.

## The inspection process and gearbox oil testing

39.    According to the CPSC notice, the recall was supposed to begin with an inspection of the recalled elevators' gearboxes by the company's authorized dealers and service companies. A copy of the CPSC recall press release notice from the CPSC web site is attached as **Exhibit C**.

40.    Because the gearbox is a sealed system with the potentially deadly worn gears and teeth inside, an internal inspection of the gears is not possible. Accordingly, the prescribed external inspection of gearboxes was limited in its ability to diagnose problems.

41.    Waupaca began recommending that owners of its recalled elevators instead contact their authorized dealers to have a service technician extract oil from the gear boxes for testing to determine whether metal shavings were present, which would indicate that the gears were worn.

42.    The oil would be, and was, sent to a Waupaca chosen laboratory in Appleton, Wisconsin to test for the presence of metal shavings. The presence of copper and other shavings in the oil above a certain level, according to Waupaca, indicates that the teeth of the gears have begun to shear and needed to be replaced to avoid failure.

43.    Waupaca maintained and represented to owners of its recalled elevators, as well as to its network of dealers and service companies, that the recalled elevators were safe to use so long as the gear box oil showed an acceptably low level of metal shavings.

44.    Waupaca's communications—directly and through its authorized dealers and repair operations—suggested that the oil test was not only diagnostic but predictive of whether an

elevator would crash.

45. The oil test, however, was of limited efficacy as a diagnostic tool, in part because Waupaca failed to instruct its authorized dealers and service companies' technicians on how to properly capture the oil. Plaintiffs are informed and believe that a more accurate diagnostic oil sample should be taken after an elevator had been set in motion, up and down, several times, rather than an oil sample from an elevator that had been standing still.

46. The use of the oil test results to assure owners of the recalled Waupaca elevator models that the elevators were safe to use was another example of the Defendant's false and misleading assertions related to its recall. A clear oil test did not, in fact, predict that an elevator was safe or was not in imminent danger of crashing. Elevators with deteriorated and dangerous gears have fallen even though their gearboxes had oil that had been tested and showed metal shavings or other debris below the levels Waupaca determined to be dangerous.

**Waupaca offers overspeed braking device instead of replacing the gearbox**

47. Waupaca knew or should have known that a proper remediation of its "recalled" elevators required complete replacement of the gearbox. As a part of the Defendant's "recall," a replacement gear box should have been made available – at no cost – to all of the owners of the recalled models of Waupaca elevators.

48. Instead, Waupaca replaced very few gearboxes. Instead, just prior to, and as part of, the recall, Waupaca began offering a new product of its own design as the remedy provided in the recall: an overspeed braking device. Waupaca sent out a second (also undated) "Important Safety Notice" for elevator owners that referred to the prior notice, and provided information on how to access the recall remedy which stated:

> If your gearbox needs to be replaced, a new gearbox will be installed free of charge
> to you. An overspeed braking device will also be installed on your elevator. This

11

overspeed braking device is an emergency braking system, which will prevent the elevator cab from falling in the event your gearbox fails. The overspeed braking device will monitor the rotations of the drum. If the drum is spinning faster than normal, the overspeed braking device will stop the elevator cab from falling. The overspeed braking device will be installed on your elevator, whether the gearbox needs replacement or not.

A copy of this Important Safety Notice is attached as **Exhibit D**.

49. The device was developed by Waupaca engineers to halt and catch an elevator when it began to free fall.

50. The overspeed braking device was offered as a panacea to owners of the recalled elevators to allow them to continue using their recalled elevators without concern of falling and crashing.

51. However, once again, Waupaca's assertions were false and misleading. Waupaca did not inform its authorized dealers and service operators that the overspeed braking device did **not** always effectively halt and catch a falling elevator.

52. In June 2020, an elevator in Brunswick County, North Carolina, that had been cleared with testing of an oil sample, and which had had an overspeed braking device installed, crashed with a passenger inside, causing serious injury.

53. In addition, the overspeed braking devices were and are in short supply; some owners waited, or have to wait, two to three years to receive the device.

54. Although the replacement gear boxes and overspeed braking devices were supposed to be offered to all owners of recalled elevators free of charge, Waupaca did not do that.

55. At all relevant times, Waupaca knew that some of the owners of its recalled models, including some of the Plaintiffs and many Class Members, were senior citizens or persons with disabilities who relied on the elevators to move about their homes, and access all part of their homes. For many years prior to the recall, having reports that at least 15 of its elevators had

12

crashed, causing injury, Waupaca knew that its elevators' gear boxes had gears that sheared, causing the elevators to free fall and crash. Waupaca knew that persons relying upon the elevators and using the elevators were in serious danger but failed to disclose this information to Plaintiffs and the Class Members.

56.     Waupaca's Notice in 2018, prior to the recall, confirmed that injury to the owners of soon-to-be-recalled elevators was foreseeable. It warns, "If your elevator . . . is not repaired, the elevator may drop unexpectedly with you in it and you may be injured."

57.     Yet Waupaca persisted on a course of false and misleading statements, concealing crucial information from the owners of its recalled elevators, which have crashed without displaying any of the enumerated "symptoms" Waupaca described, without having high levels of metal shavings in its gear box oil, and despite having an overspeed braking device installed.

58.     For Plaintiffs, it took information from an outside party to understand that, despite the lack of "symptoms," despite having "passed" their oil test by a Waupaca-designated lab, despite having an overspeed braking device installed, their elevators were dangerous to themselves, their families and guests.

**Plaintiffs Tis**

59.      Plaintiffs William and Elizabeth Tis learned that Waupaca had "identified problems" with the gearbox in elevators including their own from their elevator maintenance technician at Hodges Electric in Wilmington, North Carolina in the fall of 2018.  Oil from the gearbox of their elevator was tested and they were told it showed no metal shavings. The Vice President of Operations for Waupaca, Gary Ziebell, represented in an email that the Tis gearbox "just needs fresh oil." That was in November 2018.  A true and correct copy of the email is attached as **Exhibit E**.

13

60.     In the Spring of 2019, however, when Plaintiff William Tis called to schedule his annual service of the Waupaca elevator, Hodges Electric informed him the recalled elevators were so dangerous they would not work on them at all.

61.     Plaintiff William Tis turned to another local elevator service company, Port City Elevators ("PCE"), to install the overspeed braking device recommended by Waupaca. Plaintiff Tis paid $2,286.91 to have the Waupaca-developed and -recommended overspeed braking device installed on his Waupaca elevator in the summer of 2020.

62.     Then, on March 4, 2021, Plaintiff Tis received notice from PCE that the overspeed braking device is faulty and that his elevator should not be used. By then, Plaintiff Tis's beachfront home was booked for vacation rentals every week from April 1 to November 1, 2021.  On March 8, 2021, he contacted PCE and scheduled replacement of all parts of his Waupaca elevator except for the carriage for early May 2021; the cost: $12,988.

### Plaintiffs Hooks

63.     Plaintiffs Barry and Brenda Hooks live year-round in their home featuring one of Waupaca's recalled elevator models.

64.     Like other Plaintiffs and Class Members, Barry and Brenda Hooks learned of potential problems with their Waupaca elevator from their elevator servicer. In the Spring of 2018, in advance of the recall announcement, PCE forwarded to them a copy of Waupaca's "Important Safety Notice," which described the "Symptoms" they were supposed to lookout for.

65.     In late June 2018, they received a letter from Waupaca Vice President and Operations Manager Gary Ziebell stating that the company "would like to schedule a free inspection of your gearbox," and providing an 800 number to call to get it scheduled.

66.     Although the Plaintiffs Hooks had not seen or heard any of the troubling

14

"Symptoms," they agreed to have the diagnostic gear box oil testing performed.

67.     The results indicated no metal shavings in the oil.

68.     On November 21, 2018, Port City Elevator forwarded a copy of a press release from the CPSC regarding the Waupaca Recall to all of its customers.

69.     Plaintiffs Hooks, at the direction of Waupaca, and consistent with the recall, had an overspeed braking device installed.

70.     Plaintiff Barry Hooks remained concerned that the original fix described in Waupaca's "Important Safety Notice," namely replacement of the gear box – had not occurred.

71.     Then in early 2021, Plaintiffs Hooks received a notice from PCE, their regular elevator service operator, that PCE would no longer provide any services on the recalled Waupaca models without customers signing a waiver releasing them from liability, including inspection, regular maintenance, repairs or modifications.

72.     Plaintiffs Hooks were told by PCE that Waupaca would allow them a discount on replacing the mechanical workings of their elevator – or they could pay full price for a new elevator from a new company.

**Plaintiffs McMillian**

73.      Plaintiffs Mark and Wanda McMillian were alerted to the Waupaca recall in 2019 when Wanda McMillian reached out to PCE, which had performed their previous inspections and service. PCE informed the McMillians that their elevator model was subject to the recall; per information from Waupaca, PCE told the McMillians they should not use the elevator until their gearbox oil had been sampled and tested.

74.     The oil testing recommended by Waupaca was performed by PCE in July 2019, along with an inspection, cleaning, and annual service.

15

75. Plaintiffs McMillian were told that the results of their oil testing were normal. PCE put the McMillians on a waiting list to receive an overspeed braking device from Waupaca.

76. For more than two years, Plaintiffs McMillian have only used their elevator for carrying groceries and similar items upstairs even though the Waupaca-recommended oil sample test indicated their elevator was not in imminent danger of crashing.

77. Plaintiff Wanda McMillian was contacted at the beginning of 2021 by PCE with the news that an overspeed braking device was available for installation. Then on March 5, 2021, she received a form email from PCE informing customers with recalled Waupaca models that PCE was "unable to perform work, of any kind, on affected units." It stated, in pertinent part:

> We want to make you aware of an occurrence, recently, in which a safety device was activated. While the device did engage, it did not completely stop the elevator which resulted in injury. This incident is being taken seriously and investigated from all angles. It is always a priority, to us, for customers to be as informed as possible. For that reason, we are sharing this with you. <u>Considering this event and your safety, we are discontinuing the installation of overspeed braking devices and are unable to perform work, of any kind, on affected units</u> **<u>with and without</u>** an overspeed braking device.
>
> **<u>We want to reiterate that your safety is our main concern, and the elevator may be unsafe for the use of human and pet transportation. At this time, Port City Elevator recommends not using the elevator for any reason as these units may pose a safety risk and we are unable to assist with service or repairs, if needed.</u>**

(Emphasis added.)

78. Plaintiffs McMillian were told their only option was to replace the workings of the Waupaca elevator, or to replace the elevator altogether.

## CLASS ACTION ALLEGATIONS

79. Plaintiffs seek relief on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure, Rule 23 as representatives of the Class defined as

16

follows:

> All owners of Waupaca residential elevator models subject to the recall, specifically, Custom Lift 450# with serial numbers 10-1001 through 10-3131, and Custom Lift 500# serial numbers 10-3132 through 10-8111; 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 through 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; and 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 through 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 shipped and installed between 1979 and 2008 that are located in or on real property in North Carolina.

80.     Defendant is excluded from the Class as well as any entity in which Defendant has a controlling interest, along with Defendant's legal representatives, officers, directors, assignees and successors.  Also excluded from the Class is any judge to whom this action is assigned, together with any relative of such judge, and the spouse and children of any such persons, and the members of the judge's staff and their children.

81.     Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

82.     Numerosity. Consistent with Rule 23, the members of the Class are so numerous that the joinder of all members is impractical.  The Waupaca elevators implicated by the recall number more than 600.

83.     Commonality. This action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.      Whether Waupaca knew of the problems and danger posed by its elevators prior to 2018 but failed to disclose this information to elevator owners;

b.      Whether Waupaca knew and failed to disclose that the danger of the elevators failing was not the result of "normal wear and tear" and failed to disclose this information to elevator owners and dealers;

c.      Whether Waupaca knew and failed to disclose that the "symptoms" it claimed

17

would reliably predict an imminent failure were not reliable;

d.      Whether Waupaca knew and failed to disclose to elevator owners that the presence of metal shavings would not reliably predict whether the elevators would fail;

e.      Whether Waupaca knew and failed to disclose to elevator owners that the overspeed braking device would not reliably prevent the elevators from failing;

f.      Whether Waupaca knew, but failed to disclose that it would not have a sufficient number of overspeed braking devices to provide to customers whose elevators were subject to the recall;

g.      Whether Waupaca knew, but failed to disclose that it would not have a sufficient number of gear boxes to provide to customers whose elevators were subject to the recall;

h.      Whether Waupaca had a duty to notify its elevator owners of gear failures and free falls that occurred between 1998 and 2018;

i.      Whether Waupaca fraudulently misrepresented the testing of oil from its recalled elevators' gearboxes as diagnostic or predictive of imminent failure;

j.      Whether Waupaca fraudulently misrepresented to elevator owners that oil testing of elevators with copper levels below 200 were safe for homeowners and others to use as normal;

k.      Whether Waupaca knew, and failed to disclose that, no matter what the results of the diagnostic oil testing, installation of an overspeed braking device developed by their own engineers would not keep Waupaca elevators from failure, resulting in a free fall and crash;

l.      Whether Waupaca's conduct, including its failure to disclose, resulted in or was the

18

proximate cause of hundreds of elevator owners, including Plaintiffs and Class members, being exposed to the risk of serious injury or death from a crashing elevator;

m. Whether Waupaca's conduct, including its failure to disclose, resulted in or was the proximate cause of elevator repair companies refusing to perform service on the recalled residential elevators, including installation of the overspeed braking devices, forcing Plaintiffs and Class members to replace their elevators or their mechanical workings;

n. Whether Plaintiffs and Class Members suffered damages or other losses because of Waupaca's failure to conduct and complete its recall with transparency, urgency and integrity; and,

o. Whether Plaintiffs and Class Members are entitled to relief.

84. Typicality. Plaintiffs' claims are typical of those of other Class Members. Plaintiffs' damages and injuries are akin to those of other Class Members, and Plaintiffs seek relief consistent with the relief sought by the Class.

85. Adequacy. Plaintiffs are adequate representatives of the Class because they are members of the Class they seek to represent, are committed to pursuing this matter against Waupaca to obtain relief for the Class and have no conflicts of interest with the Class. Moreover, Plaintiffs' attorneys are competent and experienced in litigating class actions. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

86. Superiority. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism

19

is to permit litigation against wrongdoers even when damages to an individual Plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Waupaca. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

87. _Injunctive and Declaratory Relief_. Class certification is also appropriate under Rule 23. Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

88. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

89. Finally, all members of the proposed Class are readily ascertainable.

**FIRST CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

90. Plaintiffs restate and reallege paragraphs 1 through 88 as if fully set forth herein.

91. Waupaca, in the course of its business, and in conducting its recall of certain models of elevator, negligently misrepresented material facts directly and through its authorized dealers or repair operators, as described above, concerning the risks that its elevators posed to owners and users.

92. Waupaca knew or should have known, under the circumstances, that the

20

representations were false.

93. The misrepresentations by Waupaca were made with the intent to mislead, and did mislead, consumers and regulators as to the real risks associated with the continued use of Waupaca's elevators. Further, because participation in the Fast Track Program avoided a preliminary determination of a potentially "defective product," which both Waupaca and the industry recognize would prompt significant and costly litigation throughout the country, Waupaca failed to disclose the true condition of their gearboxes, that the gearbox could fail even if there were none of the symptoms, and the oil sampling would not detect damage to the gearbox and predict elevator crashes.

94. Consequently, Waupaca failed to exercise reasonable care and competence in communicating truthful and accurate information to the Plaintiffs, failed to disclose material information, and failed to comply with the most basic standard of care for its customers.

95. Plaintiffs and Class Members relied upon the information provided to them, and the failures to disclose, by Waupaca, contacting their local elevator service offices to schedule oil samplings as instructed, and keeping alert to the symptoms identified by Waupaca as indications their gearboxes were failing, and their elevators might crash.

96. Upon information and belief, none of the Plaintiffs, and none of the currently known Class Members identified any of the "symptoms' of gearbox failure in their elevators, including the test results. When their oil sampling test results – again, touted by Waupaca as diagnostic – came back "negative" for metal shavings from a Waupaca-chosen lab in Appleton, Wisconsin, Plaintiffs and Class Members believed they had done all that was necessary to verify their elevators were safe for use.

97. Plaintiffs and Class Members were informed by Waupaca itself and/or by its

21

authorized dealers and repair operators, that the elevators were safe for use. Waupaca never disclosed that the elevators still posed a safety risk.

98.     Weeks or months later, however, Plaintiffs and Class Members received new communications from Waupaca itself and/or its authorized dealers and repair operators, that Waupaca was recommending that even if an elevator had been cleared for use by oil testing, elevator owners should have an overspeed braking device installed on the elevators subject to recall.

99.     Waupaca represented to Plaintiffs and Class Members, either directly or through its authorized dealers or repair operators, that the overspeed braking device would halt and catch the recalled elevators before they free fell and crashed even if the gearbox failed. Waupaca failed to disclose that the overspeed braking device would not prevent the free fall and crash if the gearbox failed.

100.     Plaintiffs and Class Members were led to believe that the overspeed braking device ensured the continued safe use of their elevators and relied on these representations and omissions.

101.     Oil testing of the recalled Waupaca elevators continued throughout 2019, and 2020. Overspeed braking devices were recommended and installed, beginning upon information and belief in 2019 and continuing through 2020. Waupaca still failed to disclose that the oil testing would not accurately predict elevator safety, and that the overspeed braking devices would not stop the elevators if the gearbox failed.

102.     Waupaca continued to recommend overspeed braking devices be installed as a safety fix for the recalled elevators – even after an elevator crashed in Brunswick County, severely injuring a passenger –despite the fact that the elevator that crashed had "passed" its oil test, and had had an overspeed braking device installed.

103. Plaintiffs and Class Members were left with few options.

104. As a direct and proximate result of Waupaca's misrepresentations, and failures to disclose, Plaintiffs and Class Members had reasonably believed that their elevators were safe, that their gearboxes did not pose an imminent danger and that their elevators would manifest certain "symptoms" prior to a complete failure or crash.

105. As a direct and proximate result of Waupaca's misrepresentations, and failures to disclose, Plaintiffs and Class Members had reasonably believed that the oil testing, and later the overspeed braking devices, would ensure that the use of their elevators did not pose an imminent danger.

106. As a direct and proximate result of Waupaca's misrepresentations, failures to disclose, Plaintiffs and Class Members have elevators that are – and have been, unbeknownst to them – unsafe to use. For Plaintiffs like William and Elizabeth Tis, this limits access to parts of their home, and limits their ability to rent their home to others. For Plaintiffs like Barry and Brenda Hooks, this makes it impossible to have elderly relatives stay with them. For Plaintiffs like Mark and Wanda McMillian, this has meant not being able to use their elevator for carrying anything other than groceries and other home goods for more than two years, only to learn that the overspeed braking device they had been waiting for the entire time, in order to get it free, has failed in the past.

107. Waupaca owed Plaintiffs and Class Members a duty to disclose accurate and complete information: that the elevator was being recalled because it had a defect that posed an immediate danger to users, not just because of normal wear and tear; that the oil sampling test does not always detect metal shavings even if they are present and that the oil sampling test at any rate is not predictive of the safety of the elevators; and that the overspeed braking device does not

ensure that the elevators will not crash.

108.     Had Plaintiffs and Class Members had such accurate and complete information about their Waupaca elevators, they would have stopped using them; they would have urged guests, tenants and visitors not to use the elevators.

109.     As a direct and proximate result of the breach of the duties owed to Plaintiffs and Class Members by Defendant Waupaca as set forth herein, Plaintiffs and Class Members have incurred significant expenses as set out above, including but not limited to the cost of replacing their elevators in full, or keeping the elevator carriages and having the workings replaced.

110.     All of the above damages were directly and proximately caused by the negligence misrepresentations of the Defendant such that Waupaca is liable to Plaintiffs and Class Members for damages in an amount greater than $5 million.

<u>SECOND CAUSE OF ACTION</u>
**FRAUD BY OMISSION**

111.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 88 as if fully set forth herein.

112.     Waupaca, in the course of its business, omitted to disclose material facts concerning the risks that its elevators posed to owners of its elevators, particularly risks associated with the continued use of its products following the announcement of its recall and following Waupaca's recommended testing of its products by oil sampling.

113.     Waupaca knew and omitted to disclose that its elevators were part of a recall because they are dangerously defective, not because of a problem associated with normal wear and tear, as it falsely stated to Class Members.

114.     Waupaca knew that its elevators posed an unreasonable risk of falling, injury or even death, even when its elevators did not exhibit any of the "symptoms" enumerated in its notices

24

to elevator owners. Waupaca omitted to disclose that that a symptom-less fall of its elevators continued to pose serious risk to the owners of its elevators.

115.     Waupaca knew that oil sampling of the gearbox was not a dispositive means of determining the safety of its elevators but failed to disclose the predictive shortcomings of the oil sampling test it prescribed and the continued risk the use of its elevators posed to owners.

116.     Waupaca knew or should have known that the overspeed braking device designed by its engineers and recommended for owners of recalled elevators did not ensure that its elevators would not free fall and crash, especially after the crash of one of its recalled elevators in Brunswick County, North Carolina in June 2020. Yet Waupaca omitted to disclose the failure of its overspeed braking device and the continued risk the use of its elevators posed to owners and guests.

117.     Waupaca's omission to disclose the crucial safety information regarding the risks of its elevators, and the inadequacy of the oil sampling it prescribed and provided, and the failure or failures of its overspeed braking devices, was intended to deceive, and did deceive, consumers as to the real risks associated with the continued use of Waupaca's elevators.

118.      Waupaca failed to exercise reasonable care and competence in communicating truthful, accurate, and complete information to the Plaintiffs and Class Members and therefore failed to comply with its duty of care to Plaintiffs and other owners of its elevators.

119.     As a direct and proximate result of Waupaca's omission to disclose crucial safety information to Plaintiffs and Class Members regarding the risks associated with the continued use of its elevators, Plaintiffs believed they had taken sufficient steps to ensure the safe use of their elevators.

120.     Having relied on Waupaca's material omission, and without access to the information that Defendant omitted to disclose, Plaintiffs and Class Members continued to use

their elevators – until Waupaca-authorized dealers and repair operations announced they would no longer work on the recalled models of elevators due to safety concerns.

121.    Because of Waupaca's failure to disclose that the gearbox was likely to fail and the elevator to freefall and crash, Plaintiffs and Class Members, have lost access to parts of their homes, have lost vacation rentals, have suffered the inability to host disabled loved ones, and have incurred the significant expense of replacing their elevators, or replacing the mechanical workings of their elevators.

122.    All the above damages were directly and proximately caused by Defendant's material omission that the elevators are likely to fail such that it is liable to Plaintiffs for damages in an amount greater than $5 million.

### THIRD CAUSE OF ACTION
### VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### *N.C. Gen. Stat. § 75-1.1, et seq.*

123.    Plaintiffs restate and reallege paragraphs 1 through 88 as if fully set forth herein.

124.    Plaintiffs and Class Members are owners of real property located in North Carolina and it is appropriate to apply North Carolina law to these claims because North Carolina has a significant interest in protecting the rights and safety of its property owners, residents and visitors.

125.    Defendant is a Wisconsin corporation with a registered office in North Carolina and maintains a broad and robust network of authorized Waupaca dealers, which sell, install, inspect, maintain and repair Waupaca residential elevators in the state of North Carolina. As such, Defendant is subject to the laws and regulations of the State of North Carolina, including but not limited to the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75- 1.1 ("UDTPA").

126.    The UDTPA "declares unlawful" all "[u]nfair methods of competition in or

26

affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." § 75-1.1(a).

127.    For purposes of North Carolina's UDTPA, the term "commerce" includes "all business activities, however denominated." Id. § 75-1.1(b).

128.    Defendant violated the North Carolina UDTPA by engaging in unlawful, unfair, or deceptive business acts and practices in or affecting commerce.

129.    As set out plainly above, Defendant Waupaca engaged in unfair and deceptive acts and practices including but not limited to:

    a.    Negligently misrepresenting to its elevator owners that its elevators were not being recalled because they featured a defect that posed a danger to users, but rather for an issue related to normal wear and tear;

    b.    Negligently misrepresenting to its elevator owners that the problems with its elevators' gearboxes could be fixed with a replacement gearbox – which they have not made available to Plaintiffs and most Class Members nearly three years after their recall notice in October 2018;

    c.    Negligently misrepresenting to its elevator owners including Plaintiffs and Class Members, that in the absence of a replacement gearbox, owners could have their gearboxes tested with an oil sampling to determine the safety of their elevators' continued use;

    d.    Failing to disclose or fraudulently concealing that the oil sampling test is not predictive of the safety of their elevators' continued use;

    e.    Negligently misrepresenting to its elevator owners, including Plaintiffs, that before its elevators failed, posing risk of injury or death, the elevators would exhibit tell-

27

tale symptoms alerting the owners to the imminent risk of continued use of the elevators;

f.    Failing to disclose or fraudulently concealing that the elevator "symptoms" were not dispositive signals of imminent failure of the elevators;

g.    Failing to disclose or fraudulently concealing that the overspeed braking device installed to ensure the elevators did not crash, did not in fact prevent the crash of a Waupaca elevator in Brunswick County, North Carolina, in June 2020; and

130.    Waupaca's unfair or deceptive acts and practices enumerated above occurred in the course of its dealings with regulators, dealers and consumers including Plaintiffs and Class Members; therefore said unfair or deceptive acts and practices occurred in and affecting commerce.

131.    Because of Waupaca's unfair or deceptive acts and practices described above, Plaintiffs and many Class Members continued to use their Waupaca elevators even when the company knew or should have known that it was unsafe for them to do so, relied on Defendant's false statements regarding diagnosis and safety override devices; were ultimately kept from using their homes in full and hosting family and guests, and incurred significant expense themselves to replace elevators that were part of Waupaca's so-called recall.

132.    All of the above damages were directly and proximately caused Defendant's violations of North Carolina's Unfair and Deceptive Trade Practices Act such that Waupaca is liable to Plaintiffs for damages.

133.    Defendant's actions in engaging in the above-named unlawful practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights and safety of Plaintiffs and Class Members.

134.    Plaintiffs and Class Members seek relief under the North Carolina UDTPA including, but not limited to compensation for significant damages causes by Waupaca's unlawful and unfair business practices, treble damages pursuant to N.C. Gen. Stat. § 75-16, declaratory relief; and attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16.1.

135.    In addition, pursuant to North Carolina UDTPA, Plaintiffs and Class Members seek injunctive or other equitable relief including:

       a.    Replacement of the gearboxes in all recalled models of Waupaca elevators.

       b.    Reimbursement of all costs paid by Plaintiffs and Class Members for the remedies required to operate Defendant Waupaca's recalled elevators.

       c.    Inspection of all other models of Waupaca elevators for similar defects and deficits.

       d.    Removal of Waupaca's own overspeed braking devices.

       e.    Revisions to Waupaca's overspeed braking devices such that they perform as advertised, catching and halting elevators that begin to free fall.

       f.    Improved training for Waupaca authorized dealers and repair providers.

       g.    Direct communication between Defendant Waupaca and its elevator owners moving forward.

### FOURTH CAUSE OF ACTION
### INJUNCTIVE AND DECLARATORY RELIEF

136.    Plaintiffs restate and reallege paragraphs 1 through 88 as if fully set forth herein.

137.    Plaintiffs seek a declaration that absent injunctive and declaratory relief, Plaintiffs and Class Members, their family members, tenants, visitors and guests remain in danger.

138.    Plaintiffs seek injunctive relief in the form of:

       a.    Replacement of the gearboxes in all recalled models of Waupaca elevators.

29

b.　　Reimbursement of all costs paid by Plaintiffs and Class Members for the remedies required to operate Defendant Waupaca's recalled elevators.

c.　　Inspection of all other models of Waupaca elevators for similar defects and deficits.

d.　　Removal of Waupaca's own overspeed braking devices, or modifications to Waupaca's overspeed braking devices such that they perform as advertised, catching and halting elevators that begin to free fall.

e.　　Improved training for Waupaca authorized dealers and repair providers.

f.　　Direct communication between Defendant Waupaca and its elevator owners moving forward.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the following relief:

A.　　For an Order certifying this action as a Class action and appointing Plaintiffs and their counsel to represent the Class;

B.　　For injunctive relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the execution of its recall of certain models of its elevators;

C.　　For injunctive relief compelling Defendant to provide accurate information regarding its recall to Plaintiffs and Class Members;

D.　　For injunctive relief compelling Defendant to halt distribution of its overspeed braking device;

E.　　For an Order requiring Defendant to pay for replacement gearboxes, replacement

mechanical workings or replacement elevators for Plaintiffs and Class Members, as should have been required in the original recall;

F.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.      For an award of punitive damages, as allowable by law;

H.      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I.      Pre- and post-judgment interest on any amounts awarded; and

J.      Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all issues so triable.

Dated: November 19, 2021                 Respectfully submitted,

**RHINE LAW FIRM, P.C.**

__s/ Joel R. Rhine_____

Joel R. Rhine, State Bar No. 16028
Ruth A. Sheehan, State Bar No. 48069
Martin A. Ramey, State Bar No. 33617
Janet R. Coleman, State Bar No. 12363
1612 Military Cutoff Rd., Suite 300
Wilmington, NC 28403
Telephone: (910) 772-9960
Email: jrr@rhinelawfirm.com
         ras@rhinelawfirm.com
         mjr@rhinelawfirm.com
         jrc@rhinelawfirm.com

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

Michael F. Ram (CA SBN 104805)*
Marie N. Appel (CA SBN 187483)*

31

711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6923
mram@forthepeople.com
mappel@forthepeople.com

John A. Yanchunis*
Patrick A. Barthle*
201 N. Franklin Street, 7th Floor
Tampa, Florida  33602
Telephone:  (813) 223-5505
jyanchunis@forthepeople.com
pbarthle@forthepeople.com

*pro hac vice submitted*

32